# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

FILED

Sep 30 2019, 11:08 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



**ATTORNEY FOR APPELLANT**

Daniel G. Foote
Indianapolis, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of L.C. (Child in Need of Services) | September 30, 2019 |
| and | Court of Appeals Case No. 19A-JC-839 |
| R.C. (Father), | Appeal from the Marion Superior Court |
| *Appellant-Respondent,* | The Hon. Mark Jones, Judge |
| v. | The Hon. Rosanne Ang, Magistrate |
| Indiana Department of Child Services, | Trial Court Cause No. 49D15-1811-JC-2775 |
| *Appellee-Petitioner,* | |
| and | |

Child Advocates, Inc.,

*Guardian* Ad Litem.

**Bradford, Judge.**

# Case Summary

[1]     L.C. ("Child") was born to R.C. ("Father") and S.E. ("Mother"[1]; collectively, "Parents") in July of 2018. In November of 2018, the Indiana Department of Child Services ("DCS") petitioned to have Child adjudicated a child in need of services ("CHINS") following a suicide attempt by Mother and based on allegations that neither Mother nor Father could ensure Child's safety. Parents both have a history of mental illness, and Father unilaterally stopped taking medication to address his major depressive disorder and has not sought medical treatment since mid-2018. Following an evidentiary hearing in February of 2019, the juvenile court adjudicated Child to be a CHINS and, *inter alia*, ordered that Child be placed with Father's parents, with whom he and Child were already residing. Father contends that (1) two of the juvenile court's findings are contrary to the evidence, (2) two of the juvenile court's conclusions of law are clearly erroneous, and (3) the juvenile court abused its discretion in removing Child from Father's care. Because we disagree, we affirm.

---

[1] Mother does not participate in this appeal.

# Facts and Procedural History

[2] Child was born to Mother and Father on July 25, 2018. In November of 2018, Parents and Child were living with Mother's other child, M.E., and Father's parents ("Parental Grandparents") in their home. On November 13, 2018, DCS filed a CHINS petition alleging that Child was a CHINS as to Mother because Mother had failed to provide Child with an appropriate living environment, had untreated mental-health issues, and had slit her wrist in front of M.E. in an attempt to kill herself. As for Father, DCS alleged that he had not demonstrated an ability to ensure Child's safety and well-being while she was in Mother's care.

[3] On November 14, 2018, the juvenile court held an initial/detention hearing and authorized Child's continued placement in Father's care on a temporary in-home trial visit. Also that day, Father requested home-based therapy and informed the juvenile court "of several medical issues he is currently dealing with[.]" Appellant's App. Vol. II p. 50. The juvenile court ordered Father to participate in home-based therapy. After DCS became involved and removed M.E.,[2] Mother moved out of Paternal Grandparents' home. On December 7, 2018, Mother admitted that Child and M.E. were CHINS because Mother needed assistance in addressing her mental health. The juvenile court took Mother's admission under advisement.

---

[2] As of the disposition of this case, M.E. remains in a foster placement.

[4] Around the same time, Jennifer Colasessano began providing home-based therapy to Father and determined that he suffered from major depressive disorder. Colasessano began working with Father to address his disorder and "emotion management, emotion expression, stress management," past traumatic experiences, anxiety, and substance use. Tr. Vol. II p. 78. Father also began receiving home-based case management through Tatyana Terrell in December of 2018. Terrell met with Father once or twice a week initially. Father's goals were to stay organized with a schedule, and to provide for Child's needs.

[5] On February 5, 2019, Parents were involved in an altercation with each other. Father picked Mother up from the hospital where she was seeking treatment after "she had taken an entire prescription pill bottle" and, on the way home, they began to argue. Tr. Vol. II p. 109. Father threatened Mother "three or more times that he would wreck the truck" and Mother either had to push the steering wheel or scream in order to prevent a crash. Father also threatened to kill Child to prevent Mother from seeing her and said that he could avoid jail if he killed himself as well.

[6] On February 15, 2019, the juvenile court held an evidentiary hearing regarding Father. At the time of the hearing, Child was still placed with Father in Paternal Grandparents' home. Mother testified that Father has threatened to kill himself if she left him and that she had safety concerns regarding Child being with Father. DCS family case manager Dominique Cox ("FCM Cox") also expressed concerns, testifying that Father's mental-health issues remained

unresolved. (Tr. 63). FCM Cox testified that Father disclosed that he has had mental-health diagnoses in the past for which he used to be medicated and is receiving home-based therapy to address his anxiety and depression.

[7] Colasessano testified about Father's history of mental-health issues, noting that he has been diagnosed with major depressive disorder and had experienced "a cycle of anxiety and depression[.]" Tr. Vol. II p. 84. As for addressing his mental-health issues, Father admitted that he had stopped taking his medication and that it had "been awhile" since he had sought mental-health services, perhaps last in June or July of 2018. Tr. Vol. II p. 114. When asked whether he was currently seeing a doctor to address the issues with his medication, he said "no[.]" Tr. Vol. II p. 117. Terrell testified that she had not successfully closed out Father's care and that he still needs work.

[8] As it happened, neither Colasessano nor Terrell had been aware before the hearing that Father had tried to wreck the car with Mother in it or that Father had threatened to kill Child. Colasessano testified that suicidal or homicidal ideations could be indicative of mental-health issues, and Terrell testified that "[i]t would be a huge concern" if Father had done what Mother said he did. Tr. Vol. II p. 101.

[9] After the evidentiary hearing, the juvenile court adjudicated Child to be a CHINS as to Father. The juvenile court also ordered that Child's placement be changed to Paternal Grandparents, authorized Father to continue living in their home, and ordered that his time with Child be "strictly supervised[.]" Appellant's App. Vol. II p. 109. On March 15, 2019, the juvenile court entered

its CHINS order, dispositional decree, and parental participation orders. The juvenile court's CHINS order provides, in part, as follows:

3. The DCS became involved with [Child] after [Mother] attempted suicide in front of [Child]'s four-year-old sibling. [Mother] was taken to Community North Hospital for treatment. [Child] was in the home when this incident occurred.

4. During the pendency of this cause of action, [Child] was placed in the care of [Father].

5. [Father] has been consistently engaged in home[-]based case management and home[-]based therapy since the end of December.

6. The Department of Child Services is concerned about [Father]'s mental health. On February 5, 2019, an incident occurred between [Father] and [Mother] while the two were in a vehicle. During an argument between the two, [Father] attempted to crash the vehicle multiple times. During this incident, [Father] also threatened to kill [Child, Mother] and himself.

7. [Father] has a long history of mental health needs. [Father has] been diagnosed with Major Depressive Disorder, struggles with anxiety and has ceased taking his prescribed medication. [Father]'s last contact with his mental health provider was over nine months ago.

8. [Child]'s physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of [Child]'s parent, guardian, or custodian to supply [Child] with necessary food, clothing, shelter, medical care, education, or supervision. [Father] has untreated mental health needs which have led him to threaten to take the life of his child.

9. [Child] needs care, treatment, or rehabilitation that the child is not receiving[] and is unlikely to be provided or accepted

without the coercive intervention of the Court. [Father] has ceased his mental health treatment. The coercive intervention of this Court is necessary to compel [Father] to engage in this needed treatment.

Appellant's App. Vol. II p. 138.

[10] The juvenile court continued Child's relative placement with Paternal Grandparents with the permanency plan being reunification with Parents. In Father's parental-participation order, the juvenile court ordered Father to continue home-based therapy and home-based case management, complete a psychological evaluation and follow all recommendations, and complete community mental-health services and follow all recommendations.

# Discussion and Decision

[11] Indiana Code section 31-34-1-1 provides that a child is a CHINS before the child becomes eighteen years of age if

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
> > (A) the child is not receiving; and
> >
> > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[12] The purpose of a CHINS adjudication is to "protect children, not [to] punish parents." *In re D.J. v. Ind. Dep't of Child Servs.*, 68 N.E.3d 574, 580–81 (Ind. 2017) (citations omitted). DCS bears the burden of proving that a child is a

CHINS by a preponderance of the evidence. Ind. Code § 31-34-12-3; *see also In re N.E.,* 919 N.E.2d 102, 105 (Ind. 2010). The Indiana Supreme Court has stated that

> [a] CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the [juvenile] court's decision and reasonable inferences drawn therefrom. *Id*. We reverse only upon a showing that the decision of the [juvenile] court was clearly erroneous. *Id*.

*In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (footnote omitted). Father contends that (1) two of the juvenile court's findings are contrary to the evidence, (2) the juvenile court's conclusions that Child's physical or mental condition is seriously impaired or endangered and that Child needs care or treatment that Father is unable or unwilling to provide without coercive intervention are clearly erroneous, and (3) the juvenile court abused its discretion in removing Child from Father's care.

## I. Challenged Findings

[13] Father contends that the juvenile court's finding regarding the February 5, 2018, incident is unsupported by the record. Mother, however, testified that during the incident, Father threatened Child's life and tried to wreck the car several times on the way home. Regarding the threat, Mother testified that

> [a]t one point he had stated that he was not going to allow me to see [Child]. When I told them that by law—when I told him that

by law he cannot do that. He said, "I can if I kill her." I said, "You will go to jail." He said, "Not if I kill us both."

Tr. Vol. II p. 76. While Father testified that the altercation occurred differently, the juvenile court was under no obligation to credit his version of events and did not. *See, e.g.*, *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) ("[F]actfinders are not required to believe a witness's testimony even when it is uncontradicted."). Father is requesting that we reweigh the evidence, which we will not do.

[14] Moreover, the record contains ample evidence to support a finding that Father had a history of mental-health issues that has yet to be adequately addressed. FCM Cox testified that Father disclosed that he has received diagnoses of anxiety and depression, for which Father was prescribed medication that he unilaterally stopped taking. Colasessano testified about Father's history of mental-health issues, noting that he has been diagnosed with major depressive disorder and anxiety. Father admitted that he had unilaterally stopped taking his medication and that he had not sought mental-health services since mid-2018. Father also admitted that he was not currently under the care of a doctor. Father is again asking us to reweigh the evidence, which we will not do. *See In re K.D.*, 962 N.E.2d at 1253.

## II. Challenged Conclusions

### A. Child's Physical or Mental Condition Is Seriously Impaired or Endangered

[15] Father challenges the juvenile's conclusion that Child's physical or mental condition is seriously impaired or endangered. As mentioned, the juvenile

court found that Father threatened to kill Child ten days before the evidentiary hearing to prevent Mother from seeing her, which certainly supports a conclusion that her physical condition is endangered. A juvenile court need not wait until a tragedy occurs before adjudicating a Child a CHINS. *In re R.S.*, 987 N.E.2d 155, 158 (Ind. Ct. App. 2013). Father has not established that the juvenile court's decision to treat this threat seriously was clearly erroneous.

[16] Moreover, as mentioned, the record contains ample evidence that Father suffers from unresolved mental-health issues. Father's home-based therapist diagnosed him with major depressive disorder, and, although he had been taking medicine to help him cope with his mental-health issues, he had stopped by the time DCS became involved. Father's unresolved mental-health issues also support a conclusion that Child's condition is endangered.

## B. Care is Unlikely to Be Provided Without Court Intervention

[17] Father challenges the juvenile court's conclusion that he is unlikely to address his mental-health issues without court intervention. "[T]he government is permitted to forcibly intervene in a family's life only if the family cannot meet a child's needs without coercion[.]" *Matter of E.K.*, 83 N.E.3d 1256, 1261 (Ind. Ct. App. 2017), *trans. denied*. Generally, while "the question is whether the parent[] must be coerced into providing or accepting necessary treatment for their child[,]" *id.* at 1262, the question here is whether Father must be coerced into getting the care that *he* needs in order to be a good parent to Child.

While it is true that Father is participating in home-based counseling, he is under court order to do so, and there is no indication that he would seek such counseling on his own. We find it of little help to Father that he requested the counseling from the juvenile court, because the request was made only after DCS became involved. Moreover, Father admitted that he had unilaterally stopped taking medication to treat his mental-health issues, was not currently under a physician's care, and had not seen a doctor since June or July of 2018. Simply put, there is no compelling evidence that Father would be doing anything at all to address his mental-health issues without court intervention, and the record indicates that he is not currently doing enough, even *with* court intervention. The juvenile court's conclusion in this regard is not clearly erroneous.

## III. Removal from Father's Care

Finally, Father contends that the juvenile court abused its discretion in ordering the removal of Child from his care. Indiana Code section 31-34-20-1(a) provides, in part, that

> if a child is a child in need of services, the juvenile court may enter one (1) or more of the following dispositional decrees:
>
> (1) Order supervision of the child by the department.
>
> [….]
>
> (3) Remove the child from the child's home and authorize the department to place the child in another home, shelter care facility, child caring institution, group home, or secure private facility. Placement under this subdivision includes authorization to control and discipline the child.

The juvenile court ordered that Child be placed with Father's parents and that Father could continue to reside with his parents but could only have supervised visitation with Child. Father contends that this disposition seems to be based exclusively on the fact that Father and Father's mother had arranged a babysitter for Child during the evidentiary hearing. Suffice it to say that we see nothing in the record to support this contention. The juvenile court's concerns about Child remaining in Father's care are clear from the record and have nothing to do with a babysitter: Father's threat to kill Child and his unaddressed mental-health issues. Given these concerns, we cannot say that the juvenile court abused its discretion in crafting a dispositional order that limits Father's contact with Child to supervised visitation, at least for the time being.

We affirm the judgment of the juvenile court.

Vaidik, C.J., and Riley, J., concur.